CHAMPIONS GOLF CLUB, INC.,
Plaintiff–Appellant,

v.

THE CHAMPIONS GOLF CLUB,
INC., Defendant–Appellee.

No. 94–6197.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 5, 1995.

Decided March 21, 1996.

Robert W. Willmott, Lexington, KY, Thomas P. Alexander (argued and briefed), Daniel V.S. McEvily, Alexander & McEvily, Clayton J. Bushman, Browning, Bushman, Anderson & Brookhart, Houston, TX, for plaintiff-appellant.

Steven F. Vicroy (argued), Joseph B. Murphy (briefed), Murphy & Enlow, Lexington, KY, for defendant-appellee.

Before: KENNEDY, GUY, and RYAN, Circuit Judges.

RYAN, Circuit Judge.

The plaintiff, Champions Golf Club, Inc., of Houston, Texas, brought suit pursuant to the Lanham Act, 15 U.S.C. § 1051 *et seq.,* alleging that the defendant, The Champions Golf Club, Inc., of Nicholasville, Kentucky, committed service mark infringement and unfair competition through false designation. The district court issued a judgment for Nicholasville following a bench trial, concluding that

there was no likelihood of confusion in the parties' use of the CHAMPIONS mark.

On appeal, Houston claims that the district court erred in concluding that there was no likelihood of confusion in the parties' simultaneous use of the CHAMPIONS mark, and that Houston had not proved the elements of a Lanham Act unfair competition claim based on a theory of false designation. We also consider Nicholasville's argument that, even if Houston's arguments are well-taken, Nicholasville is entitled to a prior user defense, an issue resolved against Nicholasville by the district court. For the reasons that follow, we will vacate the district court's opinion, and remand for further proceedings.

## I.

Jimmy Demaret, now deceased, and Jack Burke Jr. are two former golfing champions who, in 1957, retired from the professional tour and opened a golf club in Houston, Texas. They named the club "Champions Golf Club" at the suggestion of an advertising and consulting agency, meaning to allude to the championship status of Demaret and Burke. Houston opened for play in 1959, and began using the CHAMPIONS mark in 1960 to designate its golfing and golfing-related services. On December 13, 1978, Houston registered the mark with the State of Texas.

From the time of its opening, Houston was recognized as an excellent golf course and club facility. It hosted, for example, the 1969 U.S. Open. However, because Demaret and Burke "shunned commercial exploitation of the game," they did not attempt to attract other professional tours until the 1990 Nabisco Open. Nonetheless, Houston has actively sought national events, and has hosted a number of them. For example, the Champions Cup has been held at Houston 27 times; the Houston Champions International has been held at Houston five times; the Southern Amateur Championship was played at Houston in 1973 and 1980; and the U.S. Amateur Championship was played there in 1993.

The Houston club hosts national tournaments for marketing promotion purposes rather than for profit-making. Houston derives the bulk of its revenue from its members. Although the majority of its members are residents of Texas, the Houston club has members from 27 states, the Virgin Islands, and Singapore. Moreover, approximately 10% of its gross revenue comes from visiting golfers.

In 1985, Thomas Heilbron began planning a residential subdivision and golf course in Nicholasville, Kentucky, near Lexington. The name of the subdivision is "Champions." Nicholasville first used the CHAMPIONS mark in relation to golfing services on February 26, 1986. On July 1, 1986, Nicholasville registered the mark with the Commonwealth of Kentucky.

The Nicholasville club, like Houston, a private, members-only club, opened for play on June 3, 1988, and immediately began soliciting the USGA, the PGA, and other sanctioning organizations for tournaments. Since its opening, Nicholasville has hosted several tournaments, including the Kentucky Open and U.S. Senior Challenge National Tournament in 1989; a local U.S. Open qualifying round and the National Women's Western Amateur in 1990; the Women's SEC Tournament, the Kentucky Intercollegiate Tournament, and the Kentucky Open in 1991; and the Men's NCAA Tournament in 1993. Like Houston, the majority of Nicholasville's members are local, but it does have members from 16 states and Japan. In fact, both clubs have members from the states of California, Colorado, Florida, Georgia, Illinois, Missouri, New Jersey, New York, Ohio, Pennsylvania, South Carolina, Tennessee, and West Virginia, and at least one Kentuckian is a member of Houston's club.

In the late 1980s, Houston learned that other clubs, including Nicholasville, had begun using the CHAMPIONS mark, and Houston therefore applied for federal registration in order to protect its mark. On May 15, 1989, Houston sent a "cease-and-desist" letter to Nicholasville, and on March 6, 1990, the CHAMPIONS mark was accepted on the principal register of the U.S. Patent & Trademark Office as Houston's service mark for "providing golfing and country club services." Nicholasville continued its use of the

mark, and so the plaintiff brought suit requesting injunctive relief and damages, and alleging claims of service mark infringement and unfair competition under the Lanham Act, as well as common-law unfair competition and service mark infringement claims under the laws of Kentucky and Texas.

Following a bench trial, the district court concluded, for reasons discussed in more detail below, that Houston failed to show a likelihood of confusion in the parties' dual use of the CHAMPIONS mark. The court disposed of Houston's unfair competition claim by noting that, since unfair competition requires the same proofs as an infringement claim, its unfair competition claim, too, failed. Houston then appealed.

## II.

### A.

 The Houston club brought its claim for mark infringement under the section of the Lanham Act that provides, in pertinent part, that

[a]ny person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[,]

. . . .

shall be liable in a civil action by the registrant[.]

15 U.S.C. § 1114(1). The central inquiry here, then, is whether Nicholasville's use of the CHAMPIONS mark is "likely to cause confusion." This court has held that whether there is a likelihood of confusion depends on consideration of eight factors:

1. the strength of the plaintiff's mark;
2. the relatedness of the services;
3. the similarity of the marks;
4. the evidence of actual confusion;
5. the marketing channels used;
6. the likely degree of purchaser care;

7. the defendant's intent in selecting the mark; and
8. the likelihood of expansion of the product lines.

*Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1186 (6th Cir.1988) (*Wynn I*) (citing *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642 (6th Cir.) (*Frisch's I*), *cert. denied,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982)). The *Wynn I* court explained the proper approach to these factors as follows:

These factors are simply a guide to help determine whether confusion would be likely to result from simultaneous use of the two contested marks. They imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful.... "[T]he general concept underlying likelihood of confusion is that the public believe that 'the mark's owner sponsored or otherwise approved of the use of the trademark.'"

*Id.* (citation omitted). To frame it another way, the "ultimate question [is] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,* 931 F.2d 1100, 1107 (6th Cir.1991).

 Whether there is a likelihood of confusion is a mixed question of fact and law. *Wynn I,* 839 F.2d at 1186. We apply a clearly erroneous standard to the district court's findings of fact supporting the likelihood of confusion factors, but review *de novo* the legal question of whether those foundational facts constitute a "likelihood of confusion." *Id.* (citing *Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1264 (6th Cir. 1985) (*Frisch's II*)). This standard of review applies both to a mark infringement claim and an unfair competition claim. *Wynn Oil Co. v. American Way Service Corp.,* 943 F.2d 595, 604 (6th Cir.1991) (*Wynn II*).

### 1. Strength of Mark

 " 'A term for which trademark protection is claimed will fit somewhere in [a] spectrum which ranges through (1) generic

or common descriptive and (2) merely descriptive to (3) suggestive and (4) arbitrary or fanciful.'" *Induct–O–Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir.1984) (citation omitted). "[W]hether a mark is regarded as 'strong' or 'weak,' 'original, arbitrary, fanciful' or 'generic, descriptive, geographic' is but one of the elements to be considered in determining whether confusion is likely to result." *Id.* at 364 (internal quotation marks and citation omitted). The stronger the mark, the more likely it is that encroachment on it will produce confusion. *Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir.1987). "Accordingly, the strong mark enjoys greater protection while the weak mark is afforded little support." *Hindu Incense v. Meadows,* 692 F.2d 1048, 1050 (6th Cir.1982). The district court concluded that "since Houston's mark is arbitrary, it is strong as a matter of law," but provided no explanation for its conclusion that the mark was arbitrary.

■ A generic term is the weakest type of mark; it is a term used to commonly describe the relevant type of goods or services, and "'cannot become a trademark under any circumstances.'" *Induct–O–Matic,* 747 F.2d at 362 (citation omitted). Examples of unprotectible generic names are "aspirin," "escalator," and "light beer." J. THOMAS McCARTHY, McCARTHY'S DESK ENCYCLOPEDIA OF INTELLECTUAL PROPERTY 139 (1991).

■ Descriptive terms come next in the hierarchy: "'A merely descriptive term specifically describes a characteristic or ingredient of an article.'" *Induct–O–Matic,* 747 F.2d at 362 (citation omitted). Examples of descriptive marks are BEST, SUPERIOR, and PREFERRED. McCARTHY, DESK ENCYCLOPEDIA, *supra,* at 93. A descriptive mark "is entitled to protection only upon a showing of secondary meaning," *Hindu Incense,* 692 F.2d at 1050, that is, by "becoming distinctive of the applicant's goods." *Induct–O–Matic,* 747 F.2d at 362 (internal quotation marks and citation omitted).

To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, "That is the article I want because I know its source," and not the negative inquiry as to "Who makes that article?" In other words, the article must proclaim its identification with its source, and not simply stimulate inquiry about it.

*S.P.A. Esercizio v. Roberts,* 944 F.2d 1235, 1239 (6th Cir.1991) (citation omitted), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992).

■ The third type of term is "suggestive," which, as the word implies, "'suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods.'" *Induct–O–Matic,* 747 F.2d at 362 (citation omitted). Examples are CITIBANK, which connotes an urban or modern bank, or GOLIATH, for wood pencils, connoting a large size. McCARTHY, DESK ENCYCLOPEDIA, *supra,* at 322. A suggestive term is considered stronger than one that is merely descriptive, and does not require proof of secondary meaning.

■ Fanciful and arbitrary marks are the strongest. *Little Caesar,* 834 F.2d at 571. "An 'arbitrary' mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached," such as CAMEL cigarettes or APPLE computers. *Id.* "A 'fanciful' mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned," such as EXXON or KODAK. *Id.*

On appeal, Houston argues that Nicholasville presented no evidence at trial to contradict the district court's finding that Houston's mark is arbitrary; Nicholasville, on the other hand, suggests that the district court's finding was clearly erroneous, and that CHAMPIONS is a merely descriptive term which has acquired no secondary meaning.

■ We think the district court erred in concluding that the CHAMPIONS mark was arbitrary. The term "champions," while having a "significance recognized in everyday life," is obviously not a term that is "unrelated" to golfing services, and unrelatedness is

central to the definition of an arbitrary term. Instead, the term is quite closely related to sports in general, and to golf in particular. Thus, the sole question is whether CHAMPIONS is a descriptive or a suggestive mark; the other categories plainly do not apply. It will be necessary on remand for the district court to reconsider the issue of the strength of the mark, and to determine whether the mark is descriptive or suggestive. In making the determination as to which designation properly applies, the district court should recognize that the fact that a mark is registered on the principal register creates a presumption that the mark is not descriptive. *Hindu Incense,* 692 F.2d at 1050. The Lanham Act provides that a mark that is "merely descriptive" may only be registered on the secondary register, and then only upon a showing of secondary meaning. 15 U.S.C. § 1052(e). Thus, the fact that the U.S. Patent & Trademark Office registered CHAMPIONS on the principal register demonstrates its judgment that the mark was not merely descriptive. Nonetheless, that presumption is not conclusive; other courts have treated a mark of "CHAMPION" as weak, and "entitled to but a very limited scope of protection." *Cf. National Biscuit Co. v. Princeton Mining Co.,* 137 U.S.P.Q. (BNA) 250, 253 (Pat. Off. Trademark Trial & App. Bd.1963), *aff'd,* 52 C.C.P.A. 844, 338 F.2d 1022 (1964). If the district court determines that the mark is descriptive, it will be necessary for it to consider whether the mark has acquired secondary meaning, entitling it to protection under the Lanham Act.

### 2. Relatedness of Services

 This factor admits of three possible scenarios: (1) cases in which the services of the parties are in direct competition, "in which case confusion is likely if the marks are sufficiently similar"; (2) cases in which the "services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors"; and (3) cases in which the "services are totally unrelated, in which case confusion is unlikely." *Homeowners,* 931 F.2d at 1108. Services "are 'related' if the services are marketed and consumed such that buyers are likely to believe that the services, similar-

ly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Id.* at 1109.

 The district court concluded simply that "Houston and Nicholasville provide nearly identical services." Nicholasville disagrees. It contends that although "each party operat[es] a private, members only golf club, their relatedness ends there," because the course layouts, buildings, climates, and geographical locations are different. We think, however, that the district court did not clearly err in concluding that Houston and Nicholasville provide nearly identical services. But that does not resolve the question of the "relatedness" of the services the two clubs offer. There remains for determination whether the services are directly competitive, or only somewhat related, as those "relatedness" concepts are discussed in *Homeowners.* The district court should revisit this factor on remand.

Among the factors the district court should consider in determining whether the two clubs are in direct competition are these: that both have members from states other than their home states, and even draw from many of the same states; that visiting golfers contribute significantly to the revenue of both clubs; that both clubs are in approximately the same price range; and that both clubs vie for the hosting of national and regional tournaments.

### 3. Similarity of Marks

 "In evaluating the similarity of the marks, a court must determine ... whether the mark will be confusing to the public when singly presented." *Wynn II,* 943 F.2d at 601 (internal quotation marks and citations omitted). "A proper analysis of similarity includes examining the pronunciation, appearance, and verbal translation of conflicting marks." *Wynn I,* 839 F.2d at 1188. In *Wynn I,* the court noted that "both parties use the exact term CLASSIC, which obviously is pronounced, and verbally translated in exactly the same way." *Id.; see Thrifty Rent–A–Car Sys., Inc. v. Thrift Cars, Inc.,* 831 F.2d 1177, 1179 (1st Cir.1987). Here, the district court found that "the

marks used by both clubs are nearly identical." Obviously, this finding is entirely correct. It is perhaps worth noting that while similarity alone does not compel a determination that marks are likely to be confused, *see, e.g., Electronic Design & Sales, Inc. v. Electronic Data Sys. Corp.*, 954 F.2d 713, 715 (Fed.Cir.1992), it is a factor entitled to considerable weight, *see, e.g., McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir.1979).

### 4. Actual Confusion

■ Courts have consistently held that "evidence of actual confusion is undoubtedly the best evidence of a likelihood of future confusion." *Wynn II*, 943 F.2d at 601. Nonetheless, "actual confusion is only one of several factors." *Id.* Moreover, because such evidence is "'difficult to produce and frequently discounted as unclear or insubstantial,'" *Wynn I*, 839 F.2d at 1188 (citation omitted), the factor should be "weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available," *id.* (internal quotation marks and citation omitted). Thus, absence of such evidence, in the usual case, is not weighted heavily against a plaintiff. *See id.*

Houston produced evidence of four incidents of actual confusion, three of which involved confusion among suppliers. In early 1994, a design company sent a logo to Nicholasville that Houston had ordered. In 1993, the Dallas Athletic Club sent bills to Houston for charges incurred by Nicholasville members under a reciprocity agreement with the Dallas club. Several years before that, Wilson Sporting Goods sent a supply of golf balls emblazoned with the CHAMPIONS mark to Houston, although the balls had been ordered by Nicholasville. A fourth incident took place in 1993 at a U.S. Amateur qualifying tournament in Cincinnati. An out-of-state member of Houston was introduced as a member of "Champions," in response to which the starter, mistakenly believing that the reference was to the Nicholasville club, asked the Houston member why he was attempting to qualify in Cincinnati instead of in Nicholasville. This misunderstanding was viewed by the Houston member as a serious affront.

The district court concluded that this evidence of actual confusion was "weak and unpersuasive," because it consisted of just "a few isolated instances of actual confusion ... by golfing products manufacturers and/or vendors." In the court's opinion, "[o]nly confusion among *consumers* that actually use the parties' services is relevant." It disregarded evidence of the starter's confusion, saying that "the undersigned is unaware of any authority supporting the proposition that injured pride would establish infringement of a service mark."

■ The district court was mistaken. There is no requirement that evidence of actual confusion, to be relevant, "must be confusion at the point of sale—purchaser confusion—and not the confusion of nonpurchasing, casual observers." *Esercizio*, 944 F.2d at 1243. In *Esercizio*, this court explained why:

> The Lanham Act ... was intended to do more than protect consumers at the point of sale. When the Lanham Act was enacted in 1946, its protection was limited to the use of marks "likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services." In 1967, Congress deleted this language and broadened the Act's protection to include the use of marks "likely to cause confusion or mistake or to deceive." Thus, Congress intended "to regulate commerce within [its control] by making actionable the deceptive and misleading use of marks in such commerce; [and] ... to protect persons engaged in such commerce against unfair competition...." 15 U.S.C. § 1127.

*Id.* at 1244; *see also Ameritech, Inc. v. American Info. Technologies Corp.*, 811 F.2d 960, 964 (6th Cir.1987); *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 328 (6th Cir.), *cert. denied*, 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108 (1973). Accordingly, the *Esercizio* court concluded that it was unimportant whether the actual purchaser of a knockoff of a Ferrari automobile or a Rolex watch was fully aware that he was purchasing a knockoff; the potential confusion among nonpurchasers was just as significant as that among

purchasers. *Esercizio,* 944 F.2d at 1245. This interpretation is "necessary to protect against the cheapening and dilution of the genuine product, and to protect the manufacturer's reputation." *Id.* at 1244.

On remand, then, the district court should reconsider Houston's evidence as to this factor, bearing in mind that it is not determinative of the matter that the four incidents of actual confusion did not relate to direct consumers of Houston's services. It is significant that in all four instances, the confused individuals were knowledgeable about golf clubs, and had an incentive to accurately identify the club in question, but nonetheless were unclear about which club was which. On the other hand, four incidents is not a considerable quantum of evidence of actual confusion, and minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion.

### 5. Marketing Channels Used

"This factor . . . consists of considerations of how and to whom the respective goods or services of the parties are sold." *Homeowners,* 931 F.2d at 1110. Thus, "dissimilarities between the predominant customers of a plaintiff's and defendant's goods or services lessens the possibility of confusion, mistake, or deception." *Id.* The district court concluded that "Houston's and Nicholasville's markets are by and large distinct," since the bulk of their revenue is derived from a local membership base, and they are located 1100 miles apart. It therefore dismissed the fact that "both clubs occasionally host national level tournaments that effectively act as marketing devices," as meaning only that "to a *limited* extent the clubs have overlapping markets." (Emphasis added.) It is not clear that the district court fully considered all of the evidence in the record relevant to this factor.

On remand, the district court should consider, for example, the fact that the two clubs have members from multiple states, and that both rely on visiting golfers for revenue, and thus do not draw exclusively on a local membership base. The district court should also consider that in seeking to host national tournaments as a marketing device, both clubs must solicit the same organizations for such tournaments, thus placing the clubs in direct competition for such tournaments. Relevant here is the risk of public confusion should Nicholasville, for example, host a tournament that is televised nationally.

### 6. Likely Degree of Purchaser Care

Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper. Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion.

*Homeowners,* 931 F.2d at 1111. The district court appeared to rely heavily for its ultimate conclusion on its belief that the relevant consumers were "sophisticated." It noted the great expense involved in joining the clubs— each has a $15,000 initiation fee—and concluded that the expense "is one reason why relevant consumers are . . . unlikely to be confused by Nicholasville's secondary use of the CHAMPIONS mark." It further opined that

> Houston's own witnesses testified that golfers are unlikely to seek membership or plan a golfing vacation with the wrong club because of confusion over the name of a club. *Some consumers conceivably might be momentarily confused as to whether Houston and Nicholasville are affiliated,* but the expense of the parties' services combined with the sophistication of the relevant consumers makes it unlikely any consumer would actually choose Nicholasville's services over Houston's due to Nicholasville's secondary use of the mark.

(Emphasis added.)

The district court did not clearly err in concluding that the relevant customers are sophisticated about the services in ques-

tion, and that the services are expensive, adding incentive for the sophisticated consumer to exercise care in his or her selection. The evidence uniformly supports this conclusion. Nonetheless, the court erred, we think, in according this one factor disproportionate significance. "[T]he expertise of purchasers does not necessarily preclude a finding that confusion is likely," *Homeowners,* 931 F.2d at 1111, and "where the products are identical and the marks are identical, the sophistication of buyers cannot be relied on to prevent confusion," *McGregor–Doniger,* 599 F.2d at 1137. The district court noted that despite their sophistication, golfers would likely be confused about whether the courses were affiliated, but appears not to have appreciated that *this* is the ultimate question to be answered in the likelihood of confusion inquiry. *Homeowners,* 931 F.2d at 1107. It is not particularly significant, as the district court seemed to think, that it is unlikely that any golfer would end up on the first tee at the Nicholasville course, thinking he or she was on the first tee at the Houston course, or *vice versa.* The relevant question is whether a golfer, albeit sophisticated, would likely be confused about affiliation between the two clubs. On remand, therefore, the district court should reevaluate the weight to be accorded to this factor in determining likelihood of confusion.

### 7. Defendant's Intent in Selecting the Mark

"Although intentional infringement is not necessary for a finding of likely confusion, the presence of that factor strengthens the likelihood of confusion." *Wynn II,* 943 F.2d at 602. However, a "defendant's good intentions do not in any way preclude a finding of likely confusion.... [A]bsent ... a showing [of intentional infringement], intentions are irrelevant." *Wynn I,* 839 F.2d at 1189.

The district court concluded that "[t]he evidence suggests that Nicholasville did not act with the intent to trade on Houston's goodwill." It expressly declined, however, to make an explicit finding on this point. It noted that the subdivision in which Nicholasville is situated is also named Champions,

and that there is no evidence that the course was a "copycat" of Houston. Moreover, the owner of Nicholasville articulated independent reasons for choosing the mark: the championship caliber of the University of Kentucky basketball team, and the championship caliber of the thoroughbred horses in the area.

Nonetheless, there was some evidence at trial, although not much, probative of intentional infringement. An "intent to infringe can be shown by circumstantial evidence." *Wynn II,* 943 F.2d at 603. Thus, "use of a mark with knowledge of another's prior use of the mark supports an inference of intentional infringement." *Id.* Larry Gilbert, a former golf pro at Nicholasville, testified that he told Heilbron, the owner of Nicholasville, of Houston's use of the mark in October 1987. If this testimony is found by the district court to be credible, it is some evidence pointing toward intentional infringement.

On remand, the district court is directed to make a specific finding with regard to this factor, and to give the weight to its finding that the case law suggests is appropriate. A finding of intentional infringement would be significant only in that it would show that Nicholasville intended to capitalize on the value of the mark that it did not own, and indeed, that Nicholasville believed confusion was likely. A finding that the infringement was not intentional, however, would have no significance for the ultimate inquiry of likelihood of confusion. We do not, of course, by these observations, suggest what conclusion the district court should reach.

### 8. Likelihood of Expansion of Product Lines

This inquiry is not limited simply to geographical expansion; rather, the inquiry

concerns expansion in the types of ... services offered by the parties. Inasmuch as a trademark owner is afforded greater protection against services that directly compete or are in the same channels of trade, a "strong possibility" that either party will expand his business to compete with the other or be marketed to the same

consumers will weigh in favor of finding that the present use is infringing. *Homeowners,* 931 F.2d at 1112. However, a finding that the parties "probably will not expand significantly beyond their present positions does not address the question whether [the defendant's] use of the [mark] to market his ... service is likely to cause confusion." *Wynn I,* 839 F.2d at 1189. Thus, as with the seventh factor, an affirmative finding will provide a strong indication that the parties' simultaneous use of the marks is likely to lead to confusion, while a negative finding is *not* a strong indication to the contrary.

■ The district court concluded that this factor was not particularly important in this case, because "[b]oth clubs are local entities that do not franchise." In making this conclusion, however, the district court appeared not to recognize the significance of its own findings that both clubs intended to continue trying to host national tournaments in order to enhance their prestige. There was no ambiguity in the evidence on this score; the district court simply concluded that it was not material because the majority of the parties' revenue was derived from their membership. This conclusion ignores that the national tournaments are used as marketing devices, and that to the extent one or the other club can attract such tournaments, that club is likely to also attract new members as a result. Thus, it is possible— we make no finding in the matter—that further attempts by Nicholasville to host national tournaments would constitute an expansion within the context of this factor, and that such expansion will lead to further actual confusion. On remand, the district court should take these matters into account in making a redetermination of its findings.

In sum, the district court is directed to reconsider its findings as to each of the individual factors that underlies a determination of likelihood of confusion. In so doing, and in reaching its ultimate legal conclusion, the district court should continue to bear in mind the purpose of the inquiry: to discern whether an observer would likely be confused about whether Houston, the mark's owner, was affiliated with or was the sponsor of the Nicholasville club. The eight factors are not an end in themselves, and all are not of equal significance. The factors serve only as guides on the analytical route to the ultimate determination of whether confusion is likely to result from Houston's and Nicholasville's simultaneous use of the CHAMPIONS mark.

**B.**

In addition to its service mark infringement claim, the plaintiff brought a claim for unfair competition under section 43 of the Lanham Act, which provides that

[a]ny person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, orapproval of his or her goods, services, or commercial activities by another person....

. . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

■ The district court disposed of Houston's unfair competition claim as follows:

[T]he Court notes for the sake of clarity that Houston's unfair competition claim is parallel to its Lanham Act infringement claim. As Houston notes in its post-trial brief, unfair competition is closely related to Lanham Act infringement. Since Houston has not demonstrated likelihood of confusion, both the Lanham Act and unfair competition claims must fail together.

Additionally, the court went on to conclude that Houston had "abandoned" its false designation claim "by failing to pursue it at trial or in post-trial briefing." It appears, therefore, that the district court treated the false designation claim as if it were a distinct claim from the unfair competition claim. In fact,

or more precisely in law, false designation is simply a species of unfair competition. 15 U.S.C. § 1125(a). That the two claims are one and the same is made clear both by the language of the statute, and by many cases. *See, e.g., McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 923 (Fed.Cir.1995), *cert. denied* —— U.S. ——, 116 S.Ct. 1268, 134 L.Ed.2d 215 (1996). It may be that the district court believed that the unfair competition claim was made only under state law, and was distinct from the federal false designation claim; if it did, this is incorrect. Since the plaintiff's false designation claim and unfair competition claim are one and the same, and since, as the district court observed, the unfair competition claim was unquestionably preserved, there was no abandonment of the false designation claim.

As in an action alleging infringement of a mark, "likelihood of confusion is the essence of an unfair competition claim." *Wynn II,* 943 F.2d at 604. Thus, "the same factors are considered under section 1125(a) as are considered under section 1114." *Id.* In its reexamination of those eight factors in connection with Houston's mark infringement claim, the district court will, necessarily, reexamine its conclusion with respect to Houston's unfair competition claim, reaching the same conclusion with respect to both.

### C.

We turn, finally, to the argument, advanced by Nicholasville, that the district court erred in holding that Nicholasville is not entitled to a prior-user defense.

On remand, the district court will have occasion to consider the defense only if it concludes that Nicholasville's use of the CHAMPIONS mark is likely to cause confusion. The Lanham Act provides that if "the mark whose use by a party [ (Nicholasville) ] is charged as an infringement was adopted without knowledge of the registrant's [ (Houston's) ] prior use and has been continuously used by such party or those in privity with him from a date prior to . . . publication of the registered mark," 15 U.S.C. § 1115(b)(5)(C), then the so-called "prior user" may rely on these facts as an affirmative defense. -However, the Lanham Act cau-

tions that "this defense or defect shall apply only for the area in which such continuous prior use is proved." *Id.* Plainly, Nicholasville was not the first user of the CHAMPIONS mark, but it used the mark *prior* to Houston registering the mark; thus, the expression "prior use." After registration, there can be no new "innocent" users, and even an innocent prior user cannot expand the area of its use, because Lanham Act registration puts all would-be users of the mark (or a confusingly similar mark) on constructive notice of the mark. 15 U.S.C. § 1072; *Thrifty Rent-A-Car Sys.,* 831 F.2d at 1181.

In short, Nicholasville is only an innocent prior user if (1) it adopted the mark without knowledge of the plaintiff's prior use, and (2) it continuously used the mark in a particular geographic location from a date prior to the plaintiff's March 6, 1990, registration. As already discussed, the district court made no finding as to whether Nicholasville adopted the CHAMPIONS mark without knowledge of Houston's use of the mark because the court decided that Nicholasville would not be entitled to an innocent-user defense under any circumstances, since it did not use the mark in the limited Nicholasville area. It reasoned that "Nicholasville's decision to pursue and host national level tournaments inexorably thrusts it into the nationwide market for visiting golfers thereby violating the limited area requirement of the innocent user defense."

Nicholasville advances the following arguments. First, it contends it was a prior user on a local level prior to the effective date of Houston's registration of the service mark. Second, since it corresponded with various golf associations for consideration as a host site for tournaments and, indeed, hosted national tournaments, Nicholasville argues that it was a prior user on a national level and should therefore be permitted to continue using the mark at a national level even after Houston's registration. Finally, if found to have established prior use only on a local level, Nicholasville argues that hosting national tournaments does not expand its activity beyond the local area, because the course itself continues to be located only in Ken-

tucky, and it should therefore be permitted to use the mark to solicit these tournaments.

█ In *Thrifty Rent–A–Car System,* 831 F.2d at 1177, the court explained the applicable statutory provision as follows:

The essence of the exception embodied in § 1115(b)(5) is based on common law trademark protection for remote users. Subsection (5) confers upon a junior user . . . the right to continued use of an otherwise infringing mark in a remote geographical area if that use was established prior to the other party's federal registration. The junior user is permitted to maintain a proprietary interest in the mark even though it has no general federal protection through registration.

*Id.* at 1181 (citations omitted). The court named three elements essential to sustain the defense: (1) that the junior user (Nicholasville) adopted its mark before the senior user's (Houston's) registration under the Lanham Act, and without knowledge of the senior user's prior use; (2) that the trade area in which the junior user used the mark prior to the senior user's registration was limited in extent; and (3) that the junior user has continuously used the mark in the preregistration trade area. *Id.* Moreover, it is clear that if the

senior user located in one part of the United States has achieved a nationwide recognition of its symbol, then the [prior innocent user] doctrine . . . is not available as a defense for a junior user anywhere in the nation. This is because the respective uses of the contested mark are not "remote." The . . . defense applies only where the senior user's mark is *not known* to customers in a remote area at the critical date of the junior user's first good-faith adoption and use. The junior user of a nationally known mark may claim that he did not know of the senior user's mark. But this is quite irrelevant if it is found that an appreciable number of customers in his area did know of the senior user's mark.

J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26.06 (3d ed.1995) (footnote omitted). Thus, "[m]ere geographical distance is not controlling

where the reputation of the senior user's mark has been carried into a trade area prior to the junior user's adoption and use." *Id.* at § 26.06[2].

On remand, therefore, if it reaches this issue, the district court must make several threshold determinations. First, the court must decide whether Nicholasville was, in fact, an "innocent" prior user; that is, whether Nicholasville was aware of Houston's use of the CHAMPIONS mark when Nicholasville began using it. If it was aware, then this defense is simply not available. Even if Nicholasville was not aware of Houston's use of the mark, however, the court must determine whether Houston's use of the mark had, nonetheless, achieved nationwide recognition at the time Nicholasville began using it. If Houston had achieved nationwide recognition, then, even though Nicholasville had not heard of it, Nicholasville could not become an innocent junior user.

If, however, Houston's CHAMPIONS mark is not found to have achieved nationwide recognition, then the district court must make a finding defining the trade area, if any, where Nicholasville continuously used the mark prior to Houston's registration. *See Peaches Entertainment Corp. v. Entertainment Repertoire Assoc.,* 62 F.3d 690, 694–95 (5th Cir.1995). Nicholasville is entitled to a prior user defense as to this trade area and may not expand beyond this market. *Thrifty Rent–A–Car Sys.,* 831 F.2d at 1181.

### III.

For these reasons, we **VACATE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.