**PRIME MEDIA, INCORPORATED,**
**Plaintiff,**

v.

**PRIMEDIA, INCORPORATED fka K–III** Communications Corporation, and Primedia Intertec fka Intertec Publishing Corporation, Defendants.

No. Civ.A. 98–2349–GTV.

United States District Court,
D. Kansas.

Nov. 30, 1998.

J. Nick Badgerow, Karen Kessler Cain, Spencer, Fane, Britt & Browne, Overland Park, KS, for Prime Media Inc, plaintiff.

Kirk T. May, William D. Beil, Rouse, Hendricks, German, May & Shank, Kansas City, MO, Richard S. Mandel, Cowan, Liebowitz, Latman, P.C., New York City, for Primedia Inc., Primedia Intertec, defendants.

### MEMORANDUM AND ORDER

VANBEBBER, Chief Judge.

Plaintiff brings this trademark infringement, unfair competition, and trademark dilution action alleging that defendants' use of

the name "Primedia" infringes upon plaintiff's federal registration and common law rights. The case is before the court on plaintiff's motion for a preliminary injunction (Doc. 7). The parties presented evidence at a hearing on plaintiff's motion on September 28, 29, and October 6, 1998. For the reasons set forth below, the motion is denied.

## I. FINDINGS OF FACT

Pursuant to Fed.R.Civ.P. 52(a), the court makes the following findings of fact and conclusions of law.

1. Plaintiff PRIME MEDIA, Inc., a Kansas Corporation, publishes newsletters, trade magazines, annual reports, and brochures. Plaintiff also offers custom publishing, public relations consulting, advertising campaign development, book jacket designing, and direct mailing services.

2. Plaintiff writes and publishes the magazine *It's Time to. Feel Good* for Saint Luke's–Shawnee Mission Health System. More than half of plaintiff's annual gross revenue comes from services provided for Saint Luke's–Shawnee Mission Health System.

3. Defendants PRIMEDIA, Inc. and PRIMEDIA Intertec publish magazines, educational programs, reference materials, and rental materials. The PRIMEDIA name appears on the masthead as the publisher. Defendants own their publications outright.

4. Fifty percent of defendants' business is publishing well-known magazines, including *Seventeen, New York, Chicago,* and *Modern Bride.*

5. Defendant PRIMEDIA Intertec, a Kansas subsidiary of defendant PRIMEDIA, does a limited amount of custom publishing. Less than one percent of defendant PRIMEDIA Intertec's annual revenue comes from custom publishing.

6. Defendant PRIMEDIA recently acquired a company in Malibu, California that provides custom publishing services for Medicare. Defendant PRIMEDIA Intertec will not be involved with the Medicare custom publishing.

7. Defendants do not provide the following services which are provided by plaintiff: web site design, brochures, public relations, graphics/logo design, or direct mail.

8. Plaintiff began using the name PRIME MEDIA at the inception of the corporation in 1991.

9. Plaintiff's founders, Frederic and Janine Hron, searched library sources, including industry and telephone directories, prior to using the name PRIME MEDIA. The Hrons chose the name PRIME MEDIA because "Prime" denotes quality and "Media" is an umbrella term.

10. Plaintiff has promoted its name through direct mail, sponsored events, and advertisements in trade publications. Plaintiff has spent approximately $40,000 on promotional materials and activities in 1998. Over the course of its existence, plaintiff has spent tens of thousands of dollars promoting the company and its name.

11. On May 28, 1997, plaintiff filed a service mark application with the Federal Patent and Trademark Office for the PRIME MEDIA name and logo design.

12. On April 21, 1998, plaintiff's application was published in the Official Gazette of the Federal Patent and Trademark Office for opposition. No opposition was filed against plaintiff's application, and plaintiff received its federal registration effective July 14, 1998.

13. While plaintiff's federal trademark application was pending, defendant PRIMEDIA changed its name from K–III Communications to PRIMEDIA on November 18, 1997.

14. Prior to changing its name, defendant PRIMEDIA hired international communications firm Siegel & Gale, headquartered in New York, to provide name-changing and corporate-identity advice.

15. Defendant PRIMEDIA's legal department conducted searches regarding the availability of various proposed names.

16. Defendant PRIMEDIA's outside counsel performed a full trademark search, including common law usages, for the proposed name PRIMEDIA. The trademark

search revealed several companies using PRIMEDIA or a similar name.

17. No trademark search on behalf of defendant PRIMEDIA was performed after April 10, 1997. Because plaintiff filed its trademark application on May 28, 1997, plaintiff's use of the PRIME MEDIA name was reported only in the common law section of the search.

18. When defendant PRIMEDIA determined that PRIMEDIA was the preferred name, it engaged the services of a trademark investigator to provide in-depth information regarding companies using Primedia or a similar name.

19. Upon receiving the trademark investigator's findings, defendant PRIMEDIA purchased the rights and usage of the Primedia name from certain companies. Defendant PRIMEDIA paid $25,000 to a magazine publishing company named Primedia Group Inc. in exchange for the discontinued use of the Primedia name. Defendant PRIMEDIA purchased the Primedia corporate name from Delaware corporation Primedia Inc. for $15,000. Defendant PRIMEDIA also purchased the Internet domain name primediainc.com from Indiana corporation Primedia Inc. for $10,000.

20. On July 2, 1997, defendant PRIMEDIA filed a trademark/service mark application with the Federal Patent and Trademark Office. The Federal Patent and Trademark Office refused registration because defendant PRIMEDIA's mark, in connection with its goods and services, resembled a Florida company's registration. The Federal Patent and Trademark Office determined that defendant PRIMEDIA's mark was likely to cause confusion, mistake, or to deceive.

21. On November 14, 1997, plaintiff wrote defendant PRIMEDIA a letter informing it that plaintiff had a pending service mark application for the PRIME MEDIA name and logo design. Defendant PRIMEDIA responded that it intended to continue using the PRIMEDIA name despite plaintiff's objections.

22. Defendant PRIMEDIA changed its name from K–III Communications on November 18, 1997. It substantially promoted the new name, spending $4,283,899 on various promotions, advertisements, and other direct expenses associated with changing its name.

23. Defendants' gross revenue for 1997 was $1.5 Billion, with $250 Million net before taxes.

24. After defendant PRIMEDIA changed its name, it began changing its subsidiaries' names. In June 1998, it changed Kansas subsidiary Intertec Publishing Corporation to PRIMEDIA Intertec.

25. Plaintiff filed this action on August 7, 1998, upon receiving its federal registration effective July 14, 1998.

26. Plaintiff's office manager has documented approximately eleven phone calls from persons trying to reach defendant PRIMEDIA Intertec. Plaintiff has not received any mail intended for defendants.

27. There are other companies using plaintiff's same or similar name. Prime Media, Inc. in Hartford, Connecticut is an advertising agency offering advertising, marketing, and public relations services. PriMedia, Inc. in Rhode Island is an advertising agency providing media buying and direct marketing services. Prime Spot Media Inc. in New York and Canada is engaged in the development and operation of a closed circuit television network for shopping malls in the United States and Canada. Primedia in Atlanta provides promotional and media services. PriMedia, Inc. in Williston Park, New York offers the following services: advertising, brochures and sales kits, corporate images, direct mail, marketing and public relations strategy, newsletters, and web sites. Prime 1 Media Group, Inc. in New York specializes in telecommunications between Japan and the United States. The company provides technical expertise and cultural understanding for television productions. PrimeMedia, Inc. in Aurora, Colorado designs and develops interactive multimedia and training materials. PriMedia in Tarzana, California is a video-publishing and marketing company. PriMedia in Victorville, California offers web site development, multimedia publishing, electronic

marketing, and Internet advertising. Primedia Industries, Inc. in Oceanside, New York supplies commercial business forms, graphics, and custom imprinted advertising items. Primedia Products, Inc. in Wheeling, West Virginia distributes computer printers and other computer compatibles. Prime Media Inc. in Smithfield, Virginia sells air time for cable commercials.

## II. CONCLUSIONS OF LAW

The district court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331, 1338(a), and 15 U.S.C. § 1121(a). The court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1338(b). Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to plaintiff's claim occurred in this district and defendant PRIMEDIA Intertec can be found in this district.

■ The grant or denial of a preliminary injunction is within the sound discretion of the district court and will be set aside only if the ruling is based on an error of law or constitutes an abuse of discretion. *See Kenai Oil & Gas v. Department of Interior,* 671 F.2d 383, 385 (10th Cir.1982). A preliminary injunction is the exception rather than the rule. *See GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir.1984). "Because a preliminary injunction is an extraordinary remedy, 'the right to relief must be clear and unequivocal.'" *Chemical Weapons Working Group, Inc. v. United States Dept. of the Army,* 111 F.3d 1485, 1489 (10th Cir.1997) (quoting *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir.1991)). For the court to grant a preliminary injunction, plaintiff must establish the following:

(1) it will suffer irreparable injury unless an injunction is issued; (2) its threatened injury outweighs any harm the proposed injunction may cause to the opposing party; (3) it will likely prevail on the merits of

the litigation; and (4) an injunction, if issued, would not be adverse to the public interest.

*Id.* at 1489; *Packerware Corp. v. Corning Consumer Prod. Co.,* 895 F.Supp. 1438, 1446 (D.Kan.1995).[1]

### A. Likelihood of Success on the Merits

■ Plaintiff's trademark infringement claims involve "reverse confusion," as opposed to conventional trademark infringement claims. Conventional trademark infringement claims involve consumers mistakenly believing that the second, or junior, user's goods or services are connected with the first, or senior, user. *See Packerware,* 895 F.Supp. at 1447. On the other hand, "[r]everse confusion occurs when the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods [or services] are those of the junior user." *Id.* (quoting 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* 23.01(5), at 21 (3d ed.1992)).

Plaintiff bases its trademark claims on sections 32(1) (trademark infringement), 43(a) (false designations and descriptions), and 43(c) (dilution of famous marks) of the Federal Trademark Act, 15 U.S.C. §§ 1114(1), 1125(a), 1125(c) (the Lanham Act). Plaintiff also asserts many of the same claims under Kansas common law.

Under section 32(1), any person, without consent of the registrant, using "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with ... any goods or services ... with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action...."

Section 43(a) provides in pertinent part:

Any person who, on or in connection with any goods or services ... uses in com-

---

1. The Tenth Circuit has adopted a modified interpretation of the likelihood-of-success requirement when the movant establishes the other three requirements. *See City of Chanute v. Kansas Gas & Electric Co.,* 754 F.2d 310 (10th Cir. 1985). Because plaintiff has failed to satisfy the other three requirements necessary for a preliminary injunction, the court does not apply the modified interpretation to plaintiff's claims.

merce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which (A) is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action....

Section 43(c) provides that "[t]he owner of a famous mark shall be entitled ... to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark...."

■ To succeed on its trademark infringement claims, plaintiff must first establish the validity and protectability of its mark. *See Packerware*, 895 F.Supp. at 1447. Plaintiff's certificate of registration is "prima facie evidence of the validity of the registered mark ... and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods and services specified in the certificate ...." 15 U.S.C. § 1057(c). Plaintiff received its federal registration for its name and logo design effective July 14, 1998. Accordingly, the court assumes for purposes of this motion that plaintiff's mark is valid and protectable under the Lanham Act.

■ For plaintiff to prevail on its trademark claims under sections 32(1), 43(a), or 43(c), it must demonstrate that defendants' use of the PRIMEDIA name creates a likelihood of confusion on the part of an appreciable number of ordinary purchasers.[2] *See Packerware*, 895 F.Supp. at 1448. The likelihood-of-confusion test is also applicable to plaintiff's common law claims of unfair competition and infringement. *See id.* Categorizing plaintiff's claims as reverse confusion

does not change its burden to prove a likelihood of confusion. *See id.*

"Confusion occurs when consumers make an incorrect mental association between the involved commercial products or their producers." *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir.1998) (quoting *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1484 (10th Cir.1987) (citations omitted)). Likelihood of confusion is "considered not only in the context of confusion of source, but also in the context of confusion that results from a mistaken belief in common sponsorship or affiliation." *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 558 (10th Cir.1984).

The Tenth Circuit has identified several factors that are relevant in determining whether a likelihood of confusion exists between the two marks: (1) the degree of similarity between the marks; (2) the strength of plaintiff's mark; (3) the intent of defendant in adopting the mark; (4) similarities and differences in the parties' services and marketing; (5) the degree of care likely to be exercised by purchasers; and (6) evidence of actual confusion. *See, e.g., Heartsprings*, 143 F.3d at 554 (citing *Universal Money Ctrs., Inc. v. American Tel. & Tel., Co.*, 22 F.3d 1527, 1530 (10th Cir.1994)). "No one factor is dispositive, and the final determination of likelihood of confusion must be based on consideration of all relevant factors." *Id.* (citing *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir.1986)). The key inquiry is whether the consumer is "likely to be deceived or confused by the similarity of the marks." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Heartsprings*, 143 F.3d at 554.

#### 1. Degree of Similarity of the Marks

■ The court evaluates the similarity of the marks as they are encountered in the marketplace and examines their similarity in sight, sound, and meaning. *See Heartspr-*

---

2. For plaintiff to succeed on its trademark dilution claim, in addition to proving a likelihood of confusion, it must establish that its mark is a famous mark. 15 U.S.C. § 1125(c) provides factors for the court to consider in evaluating

whether a mark is famous. Because plaintiff has failed to establish a likelihood of confusion, the court finds it unnecessary to determine whether plaintiff's mark is famous.

*ings,* 143 F.3d at 554. "In evaluating similarity, we must not engage in a 'side-by-side' comparison. Rather, the court must determine whether the alleged infringing mark will be confusing to the public when singly presented." *Id.* (quoting *Universal Money Ctrs.,* 22 F.3d at 1531 (citations omitted)). While the terms PRIME MEDIA and PRIMEDIA are nearly identical in sight, sound, and meaning, that does not end the court's inquiry. *See Packerware,* 895 F.Supp. at 1449.

Defendants argue that substantial differences in the use and presentation of the parties' marks outweighs the similarity of the names. The court, however, finds defendants' argument unpersuasive. Defendants focus on the fact that they market their publications under prominent magazine titles—with the PRIMEDIA name appearing only in the masthead—to imply that they use PRIMEDIA only for identification and not for marketing. The court, however, is skeptical of defendants' contention that simply because they publish under prominent magazine titles, that they do not market the PRIMEDIA name. One of the reasons defendant PRIMEDIA changed its name was to better describe the company and to link the company's name with the services it provides. William Reilly, defendant PRIMEDIA's chairman and chief executive officer, stated the following in defendant PRIMEDIA's third quarter report record dated October 30, 1997:

> There is, however, little equity in the name, K–III. It sounds like a financial holding company. So, on November 18, we are changing our name to PRIMEDIA Inc. PRIMEDIA states our strategy in just one word, a word that is also our name. It reflects the "prime" positioning our company has in more than 250 specialty media niches.

The court is unpersuaded that defendants' use and presentation of the PRIMEDIA name dispels the similarity of the parties' marks.

Defendants also contend that plaintiff's "P" logo design, used in conjunction with the PRIME MEDIA name, sufficiently distinguishes the marks. While the court agrees that plaintiff's logo design helps distinguish the parties, the logo design by itself is insufficient to negate the similarity of the marks. The court concludes that the degree of similarity of the parties' marks weighs in plaintiff's favor.

■ The court notes, however, that the similarity of the parties' marks is not strengthened by the Federal Patent and Trademark Office rejection of defendant PRIMEDIA's trademark/service mark application filed in July 1997. While not legally binding, the court may consider the Federal Patent and Trademark Office rejection as persuasive authority. *See Packerware,* 895 F.Supp. at 1449. In the instant case, however, the court concludes that the Federal Patent and Trademark Office rejection is of little probative value. *See Packerware,* 895 F.Supp. at 1449 (citing *Accu Personnel, Inc. v. AccuStaff, Inc.,* 823 F.Supp. 1161, 1164–65 (D.Del.1993)). Defendant PRIMEDIA has not had the opportunity to respond to the Federal Patent and Trademark office decision, and the trademark office only determines issues of registrability, not issues of use of a trademark. *See id.*

### 2. Strength of Plaintiff's Mark

The strength of plaintiff's mark plays a significant role in the court's analysis of this case. "The stronger the mark, the more likely it is that encroachment on it will produce confusion." *First Sav. Bank v. First Bank Sys., Inc.,* 101 F.3d 645, 653 (10th Cir.1996) (quoting *Champions Golf Club, Inc. v. The Champions Golf Club,* 78 F.3d 1111, 1117 (6th Cir.1996)). "A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *Id.* at 653 (quoting *Universal Money Ctrs.,* 22 F.3d at 1533).

Defendants presented evidence of a dozen companies using Prime Media, Primedia, or similar names. Many of these companies offer services similar to plaintiff. The Tenth Circuit has "recognized the well-established principle that extensive third-party use of the disputed term indicates that the term itself deserves only weak protection." *Id.* at 654.

The significant third-party use of Prime Media, Primedia or a similar name, indicates the relative weakness of plaintiff's mark. This weakness suggests that defendants' use of PRIMEDIA does not create a likelihood of consumer confusion.

### 3. Intent of Defendants in Adopting the Term "PRIMEDIA"

With conventional trademark infringement claims, this factor examines whether the defendant "intended to deceive the public and derive benefit from a mark already established in the marketplace." *Packerware*, 895 F.Supp. at 1450 (citing *Jordache*, 828 F.2d at 1485). However, with a reverse confusion claim, "the defendant by definition is not palming off or otherwise attempting to create confusion as to the source of his product. Thus the 'intent' factor of the likelihood of confusion analysis is essentially irrelevant in a reverse confusion case." *Id.* at 1450 (quoting *Sands, Taylor & Wood v. Quaker Oats*, 978 F.2d 947, 961 (7th Cir.1992)).

■ To the extent defendants' intent may be relevant, plaintiff has failed to proffer evidence suggesting any bad faith on the part of defendants in adopting the PRIMEDIA name. Plaintiff presented evidence of defendant PRIMEDIA's knowledge of plaintiff's then common law usage of the PRIME MEDIA name. Mere knowledge, however, is insufficient to infer bad faith. *See id.*

### 4. Similarities of the Parties' Services and Marketing

The court examines the relative similarity of the parties' services because "[t]he greater the similarity between the products and services, the greater the likelihood of confusion." *Heartsprings*, 143 F.3d at 556 (quoting *Universal Money Ctrs.*, 22 F.3d at 1532). The parties' vigorously contest the degree of similarity of the parties' services. Plaintiff describes the parties as offering virtually identical services in the publishing field. Defendants, however, go to great lengths to categorize plaintiff as an advertising agency, which is distinct from defendants' publishing business.

The court finds that the similarity of the parties' services falls somewhere in between the parties' contentions. However, while both parties offer some of the same services, their marketing practices appear distinct. Defendants primarily publish well-known magazines, and educational and reference materials. Alternatively, plaintiff's market base primarily consists of businesses seeking self-promoting publications and marketing services. While there is some overlap in the parties' services, the differences in their marketing practices counsels against a likelihood of confusion.

### 5. Degree of Care Exercised by Consumers

Plaintiff admits that the degree of care likely to be exercised by consumers in purchasing marketing and publishing services is difficult to estimate. Plaintiff contends that because there have been instances of actual confusion, the court can infer that this factor indicates a likelihood of confusion. As fully discussed in the next section, however, plaintiff's proposed instances of actual confusion do not reflect consumer confusion with purchasing decisions. The court therefore determines that this factor does not weigh in favor of a likelihood of confusion.

### 6. Actual Confusion

■ "[E]vidence of actual confusion within the marketplace is strong evidence of a likelihood of confusion." *Heartsprings*, 143 F.3d at 557 (citing *Universal Money Ctrs.*, 22 F.3d at 1533). The lack of evidence of actual confusion, however, does not necessarily indicate the absence of a likelihood of confusion. *See Packerware*, 895 F.Supp. at 1451. Plaintiff focuses on approximately a dozen phone calls it received from persons trying to reach defendant PRIMEDIA Intertec as instances of actual confusion establishing a likelihood of confusion. While these phone calls indicate some sort of confusion, the court must determine if this is the type of confusion the Lanham Act guards against. To be relevant, the calls "should demonstrate actual confusion among consumers within the marketplace." *Heartsprings*, 143 F.3d at 557.

The evidence indicates that many of the phone calls were misdirected to plaintiff by Southwestern Bell Directory Assistance. The callers included persons seeking magazine subscriptions to defendants' publications, persons inquiring as to a conference sponsored by defendants, salespersons, freelance writers, and other persons seeking individual employees of defendants. "At any rate, no evidence links the confusion evinced by the calls to any potential or actual effect on consumers' purchasing decisions." *Lang v. Retirement Living Publ'g, Co.*, 949 F.2d 576, 582 (2d Cir.1991).

Additionally, even assuming that the phone calls indicate confusion associated with purchasing decisions, the court doubts the relevancy of the calls to prove plaintiff's claim for reverse confusion. The callers "erroneously believed that the senior user [plaintiff] was the source of the junior user's [defendants'] magazine." *Id.* at 583. Evidence of reverse confusion, however, would involve purchasers or prospective purchasers of plaintiff's services who believed that they were affiliated with defendants. *See id.* Plaintiff has failed to show any such evidence, and nothing in the record indicates that the callers were prospective purchasers of plaintiff's services. *See id.* "In sum, there is no reason to believe that confusion represented by the phone calls could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Id.*

### 7. All Relevant Factors Considered as a Whole

■ The Tenth Circuit has emphasized that no one factor is dispositive and that "all relevant factors must be weighed to determine the likelihood of confusion." *Heartsprings*, 143 F.3d at 558 (citing *Beer Nuts*, 805 F.2d at 925). The court has recognized the striking similarity of the two marks in sight, sound, and meaning. The court, however, finds this one factor insufficient to indicate a likelihood of confusion in light of the other relevant factors. The relative weakness of plaintiff's mark due to significant third-party use of Prime Media or similar names weighs against a finding of a likelihood of confusion.

While plaintiff's mark deserves some protection because of its registered status, the fact that these third parties—many offering services similar to plaintiff—coexist, as well as the parties' divergent marketing practices, decreases the likelihood of confusion.

### B. Irreparable Injury

■ Irreparable injury will be presumed upon a showing of trademark infringement because a trademark represents the intangible assets of reputation and goodwill. *See Packerware*, 895 F.Supp. at 1452 (citing *Amoco Oil*, 809 F.2d at 663–64). Because plaintiff has failed to establish a substantial likelihood of success on the merits, the court will not presume irreparable injury. *See id.*

■ Absent this presumption, the court finds that plaintiff has failed to provide sufficient evidence of specific irreparable injury. Plaintiff presented no evidence of irreparable injury at the preliminary injunction hearing. Plaintiff's speculative harm included increased employee time devoted to explaining the company's identity and difficulties in recruiting new employees. While the court recognizes that these distractions inconvenience any business, they do not amount to the irreparable injury necessary to justify the extraordinary relief of a preliminary injunction.

### C. Balancing of Hardships

■ The court next examines whether the injury to plaintiff outweighs any harm the preliminary injunction may cause defendants. *See Chemical Weapons Working Group*, 111 F.3d at 1489. Plaintiff, however, has failed to provide any evidence of its estimated injury. Plaintiff has been unable to demonstrate any loss of business resulting from defendants' use of the PRIMEDIA name, or to provide the court with any other evidence of estimated actual damages. *See Packerware*, 895 F.Supp. at 1453.

Defendants, on the other hand, will suffer substantial hardship if the court grants the preliminary injunction. Defendants have incurred more than four million dollars in costs associated with developing and promoting the PRIMEDIA name. Enjoining defen-

dants from using the PRIMEDIA name would result in over four million dollars in sunk costs for defendants. *See id.* Additionally, defendant PRIMEDIA Vice President of Corporate Communications David Adler testified at the preliminary injunction hearing that if defendants were prohibited from using the PRIMEDIA name, its credibility and reputation, especially among the Wall Street financial community, would be adversely affected. The court finds that in this case, "an injunction will unfairly disadvantage a second user who has expended considerable sums to promote his [mark] before the first user raised the issue of infringement." *Packerware*, 895 F.Supp. at 1453 (quoting *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268, 1279 (S.D.N.Y. 1986)).

The court feels that the ends of justice are best served by denying the preliminary injunction pending final resolution of this case. The court is troubled by the severe burden and unnecessary expense defendants would bear if the court were to grant the preliminary injunction, only to have final resolution of the case be in defendants' favor. The court concludes that plaintiff's failure to provide evidence of estimated injury, in light of the substantial hardship a preliminary injunction would impose on defendants, prohibits the court from finding that the balance of hardships weighs in plaintiff's favor.

*D. Public Interest*

█ One of the primary purposes of the Lanham Act is to guard against consumer deception regarding the source of goods and services. *See, e.g., id.* (citing *Ameritech, Inc. v. American Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir.1987)). In trademark infringement case, public interest "is most often synonym for the right of the public not to be deceived or confused." *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 197 (3d Cir.1990). Because plaintiff has failed to demonstrate a significant likelihood of confusion among an appreciable number of consumers, "the court does not believe that the public interest demands preliminary injunctive relief." *Packerware*, 895 F.Supp. at 1453. The court concludes that the public

interest is best served by permitting defendants to continue using the PRIMEDIA name pending final resolution of this case.

In conclusion, the court finds that plaintiff has failed to present evidence sufficient to warrant a preliminary injunction. Plaintiff has failed to demonstrate that its right to relief is clear and unequivocal. *See Chemical Weapons Working Group*, 111 F.3d at 1489.

IT IS THEREFORE, ORDERED that plaintiff PRIME MEDIA, Inc.'s motion for a preliminary injunction (Doc. 7) is denied.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**