**SPECTRUM VISION SYSTEMS, INC., Plaintiff,**

v.

**SPECTERA, INC., Defendant.**

**No. 97–2459–JWL.**

United States District Court, D. Kansas.

Oct. 30, 1998.

**800**

Mark E. Brown, Litman, McMahon & Brown, Philip W. Bledsoe, Shughart, Thomson & Kilroy, P.C., Kansas City, MO, for Plaintiff.

Robert L. Driscoll, Stinson, Mag & Fizzell, P.C., Jeffrey J. Simon, Christian D. Stewart, Blakwell, Sanders, Peper & Martin LLP, Kansas City, MO, Barry J. Coyne, Frederick H. Colen, Reed, Smith, Shaw & McClay, Pittsburgh, PA, for Defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Spectrum Vision Systems, Inc. brought this action against defendant Spectera, Inc. alleging trademark infringement in violation of the Lanham Act and common law unfair competition claims. The matter is presently before the court on the parties' cross motions for summary judgment.[1] Because no reasonable fact-finder could conclude that defendant's use of its name and trademark creates a likelihood of confusion with plaintiff, the court denies plaintiff's motion for summary judgment (doc. 95) and grants defendant's motion for summary judgment (doc. 93).

## I. Factual Background

Plaintiff, a Delaware corporation with its principal place of business in Kansas, began doing business as Spectrum Vision Systems, Inc. ("Spectrum") in 1987. Plaintiff offers vision care benefits to its members. Eye care providers, such as optometrists and opticians, contract with plaintiff to sell eyeglasses and contact lenses at a predetermined discounted price to individual members of plaintiff's vision care plan. Spectrum's main vision care benefits products are marketed under its federally-registered "PREFERRED VISION CARE" tradename. Plaintiff's promotional materials often include a color spectrum radiating from the outline of a human face, both of which are superimposed on an outerspace-like background.

Defendant Spectera is a Maryland corporation with its principal place of business in Maryland. Defendant offers a variety of health care benefits, including a vision care benefits plan. Defendant's vision care plan is more akin to a traditional insurance program; members of defendant's plan submit claims for reimbursement after first paying for any eye care received. Defendant's promotional materials ordinarily portray the Spectera name in large, blue letters pierced by a rainbow-colored logo.

Prior litigation between the parties prompted defendant, then United Health-Care, Inc., to change its name to Spectera, pursuant to a settlement agreement reached by the parties. Spectera applied for, and was granted, a federal registration for its "Spectera" trademark in late 1995. Defendant began doing business under the "Spectera" tradename on January 1, 1996.

The income from both parties' vision care plans is derived primarily from each plan's "sponsors." Typically, sponsors are employers, unions, or other associations that purchase a vision care plan and offer it to employees as part of a health care benefits package.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

---

1. Also before the court is defendant's motion to amend the pretrial order (doc. 107). Defendant moves the court to amend its pretrial order to reflect that plaintiff's alleged mark, "Spectrum,"

is not at issue in this case. The court has considered defendant's motion, but denies it as moot in light of its grant of summary judgment in defendant's favor.

(1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548(quoting Fed.R.Civ.P. 1).

## III. Analysis

■ The Lanham Act prohibits the unauthorized reproduction, colorable imitation, or use of "any word, term, name, symbol, device or combination thereof... which is likely to cause confusion, or to cause mistake" in the marketplace as to the origin of goods or services. 15 U.S.C. § 1125(a) (1991). The confusion against which the Lanham Act is designed to protect occurs when, because of design, label, or name similarities, the consuming public incorrectly assumes two competing products or services are produced by the same source. *Jordache Enters., Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1484 (10th Cir.1987).

■ A trademark need not be registered to be entitled to protection under the Lanham Act. Indeed, it is well-settled that § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), "protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Accordingly, plaintiff's failure to register its alleged trademark is not fatal to its infringement claim, and the court will analyze the "likely confusion" issue in accordance with the test originally formulated for registered trademarks.

■ In a trademark infringement action, the plaintiff bears the burden of proving likelihood of confusion. *Jordache,* 828 F.2d at 1484. The following factors are relevant to determine whether competing trademarks are confusingly similar: "(a) the degree of similarity between the marks; (b) the intent of the alleged infringer in adopting its mark; (c) the relation in use and the manner of marketing between the goods or services marketed by the competing parties; (d) the degree of care likely to be exercised by purchasers; (e) evidence of actual confusion; and (f) the strength or weakness of the marks." *First Sav. Bank v. First Bank Sys., Inc.,* 101 F.3d 645, 652 (10th Cir.1996). The Tenth Circuit has counseled that "[a]ll of the factors are interrelated, and no one factor is dispositive" to the likelihood of confusion analysis. *Jordache,* 828 F.2d at 1484.

Although the likelihood of confusion issue is a question of fact, the Tenth Circuit has acknowledged that summary judgment in favor of the alleged infringer may be granted "in appropriate cases." *Universal Money*

*Centers, Inc. v. American Tele. & Telegraph Co.*, 22 F.3d 1527, 1530 n. 2 (10th Cir.1994). Indeed, as the Tenth Circuit explained,

> courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source. Though likelihood of confusion is frequently a fairly disputed issue of fact on which reasonable minds may differ, the issue is amenable to summary judgment in appropriate circumstances.

*Id.* (quoting *Warner Bros. v. American Broadcasting Cos.*, 720 F.2d 231, 246 (2d Cir.1983)).

### A. Similarity of the Marks

■ The degree of similarity between trademarks "is tested on three levels as encountered in the marketplace: sight, sound, and meaning." *Universal Money*, 22 F.3d at 1530–31. "In evaluating similarity, [the court] must not engage in a side-by-side comparison." *Id.* at 1531. Instead, "the court must determine whether the alleged infringing mark will be confusing to the public when singly presented." *Id.* Finally, each mark may not be dissected into logical components and then compared, but must instead "be considered as a whole." *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir.1998); *First Sav. Bank v. First Bank Sys., Inc.*, 101 F.3d 645, 653 ("similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features").

■ In this case, plaintiff claims that both its tradenames, "Spectrum" and "Spectrum Vision Systems, Inc.," as well as its "color line" logo, a pictorial representation of the color spectrum which becomes wider toward the right, are at issue. The court considers each mark in turn.

### 1. *Color line logo*

Plaintiff maintains that defendant's color line, like its own, begins at the left and gradually becomes wider at the right, and that even though the colors are scrambled and blue is omitted in defendant's mark, few would notice those fine differences, and in-

stead would conclude that the marks are the same. Defendant argues that its color-line logo differs materially from plaintiff's in three respects: (1) the colors are not presented in the same order; (2) the color blue is omitted from the color line; and (3) plaintiff's color-line is presented as pointing toward the eye of a human face, and superimposed on an outerspace-like background.

The court acknowledges that, at first blush, the similarity between the parties' varying color "lines," if placed side-by-side and dissected from each line's typical surroundings, is somewhat striking. The court notes, however, that such a dissection followed by a side-by-side analysis is disfavored by the Tenth Circuit. *First Sav. Bank*, 101 F.3d at 653. Considering each mark as a whole, the court finds that the similarities between the color lines are less significant. Specifically, defendant's color line is always presented across its Spectera tradename, whereas plaintiff's color logo is rarely presented in close proximity to the Spectrum name, but instead typically displayed as protruding from the eye of a human face placed against a dark, outerspace background. Thus, once each color line is examined in its customary context, the competing marks are more visually distinct than they would at first appear.

### 2. *Tradenames*

■ With respect to the parties' tradenames, defendant maintains that its tradename is composed of three syllables, and is pronounced "Spek–tair–UH." Defendant argues that the additional syllable renders its tradename both visually and phonetically distinct from plaintiff's "Spectrum" mark. Moreover, defendant claims, plaintiff's name is usually presented as "Spectrum Vision Systems, Inc.," whereas "Spectera" is generally only followed by "Inc." More importantly, defendant maintains, plaintiff markets its services primarily under the "Preferred Vision Care" tradename, rather than under "Spectrum" or "Spectrum Vision Systems, Inc." Therefore, the vast majority of plaintiff's literature either references the "Spectrum" name only secondarily, in ordinary

type, or omits any mention of "Spectrum" entirely.

Plaintiff argues that, additional syllable notwithstanding, defendant's tradename is both visually and phonetically similar to plaintiff's mark for a number of reasons, including: (1) each name derives from the identical "spect-" root, (2) "Spectera" is only one letter removed from "spectra," the plural form of "spectrum," and (3) those with a Midwestern accent may pronounce "Spectera" as "Spectra," thereby decreasing any phonetic dissimilarity attributable to the additional syllable. Plaintiff also argues that its product is not always marketed under the "Preferred Vision Care" tradename, but also under "Spectrum Vision Systems, Inc."

The court agrees with plaintiff's assertion that the words "Spectrum" and "Spectera" are similar both visually and phonetically. Nonetheless, the court notes that, as in *Heartsprings,* "plaintiff uses [its] trade name primarily for identification, not marketing purposes." *Heartsprings,* 143 F.3d at 555. While it is true that many of the exhibits offered by the plaintiff include a large-type, stylized "Spectrum Vision Systems, Inc." logo, the court is impressed by the fact that in most of the exhibits, the "Preferred Vision Care" logo is more prominently presented. In fact, whereas the "Preferred Vision Care" logo is conspicuously displayed on most of the identification cards distributed to individual members, the only mention of "Spectrum" is incidental. In contrast, defendant's tradename is consistently presented in large blue letters, pierced by its color line logo. As in *Heartsprings,* "plaintiff's and defendant's use and presentation of their respective trade names bear no similarity beyond the obvious sameness of spelling" and are thus somewhat visually distinct. *Id.* Consequently, the court "decline[s] to weigh this factor firmly in plaintiff's favor." *Id.*

### B. Intent of Defendant in Adopting the Mark

The second factor relevant to the likelihood of confusion analysis is the intent of the defendant in adopting the disputed mark. This factor is relevant because a defendant's "deliberate adoption of a similar mark may lead to an inference of intent to pass off goods as those of another which in turn supports a finding of likelihood of confusion." *Beer Nuts, Inc. v. Clover Club Foods Co. (Beer Nuts II),* 805 F.2d 920, 927 (10th Cir.1986). "[M]ere knowledge of a similar mark," on the other hand, "should not foreclose further inquiry." *Universal Money,* 22 F.3d at 1532 (citation omitted). Indeed, "[t]he proper focus is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Jordache,* 828 F.2d at 1485.

According to defendant, the "Spectera" name was one of a number of potential names generated by an outside advertising agency, hired by defendant to create and promote a new name for defendant's services. The Spectera mark was then selected by a majority vote of defendant's employees. Defendant then engaged an attorney to perform a trademark search with respect to the Spectera name and that lawyer concluded that the likelihood of confusion with a previously-registered mark was minimal.

Defendant has admitted that, although most of its employees were unaware of plaintiff's presence in the eye care industry, at least one employee had knowledge of Spectrum's existence prior to defendant's adoption of the Spectera mark.[2] The court finds this fact does not compel a finding that defendant adopted the mark with the intent to trade on plaintiff's goodwill, however, particularly in light of the manner in which the new name was selected, the extensive tradename search defendant performed before choosing the Spectera mark, and defendant's subsequent efforts to promote its new name. In fact, the Tenth Circuit has affirmed summary judgment in favor of the alleged infringer despite the fact that defendant's own counsel were "undoubtedly" aware of plaintiff's "federally-registered marks and that [defendant] and other owners of the mark might challenge [defendant's] use" of the dis-

---

**2.** The plaintiff does not dispute defendant's assertion that when it adopted the Spectera mark, defendant was unaware of plaintiff's alleged col-
or spectrum logo. Accordingly, the court considers defendant's intent only with respect to the Spectera tradename.

puted mark. *Universal Money*, 22 F.3d at 1532. There, as here, the court found this prior knowledge insufficient to support a likelihood of confusion with respect to the "larger factual context of th[e] case." *Id.*

### C. Similarity of Services and Marketing Practices

#### 1. *Similarity of Services*

The court must next consider the similarity between the parties' services. This factor is important because "[t]he greater the similarity between the products and services, the greater the likelihood of confusion." *Universal Money*, 22 F.3d at 1532 (citation omitted). To some degree, this factor weighs in plaintiff's favor because the parties are both involved in the eye care benefits industry. Defendant insists, however, that the similarity between plaintiff's and defendant's services ends there.

Defendant contends that the parties' services are significantly different because of the manner in which the vision care plan's discount is applied. Plaintiff's plan is somewhat like a coupon for discounted eye care, such that each patient must present his or her membership card to receive a point-of-sale discount from the eye care provider. Defendant's plan, on the other hand, is more akin to an insurance policy under which the insured pays an insurance premium to Spectera, and Spectera reimburses the insured for a portion of the cost of his or her vision care.

The court finds these distinctions between plaintiff's and defendant's services somewhat hypertechnical, but acknowledges that the relevant inquiry is whether consumers in the marketplace are likely to be confused. To those familiar with the health care industry, these seemingly subtle differences are probably fairly significant such that the similarity of services is relatively minimal. Indeed, the court suspects that potential sponsors, the sophisticated purchasers of both parties' plans,[3] would hardly consider the primarily point-of-sale discount plan offered by plaintiff to be the functional equivalent of the defen-

dant's more traditional insurance policy program. Even so, because sponsors rarely offer more than one type of vision care plan, the parties effectively compete in the same market. Thus, the court assumes, for summary judgment purposes, that this factor weighs in Spectrum's favor.

#### 2. *Similarity of Marketing*

Both parties' marketing efforts are typically aimed toward the same consumer universe: those sponsors interested in providing eye care benefits to their employees. Furthermore, both parties advertise in industry trade journals, and submit promotional materials to potential sponsors. To some extent, then, this factor also weighs in Spectrum's favor.

### D. Evidence of Actual Confusion

#### 1. *Specific Instances*

The Tenth Circuit has instructed that "[a]lthough by no means strictly necessary, evidence of actual confusion is often considered the best evidence of likelihood of confusion." *First Bank*, 101 F.3d at 656 n. 14. Evidence of actual confusion does not, however, "dictate a finding of likelihood of confusion." *Universal Money*, 22 F.3d at 1535.

To evaluate the relevance of any alleged instance of actual confusion, "[t]he court must first clarify whose potential confusion may be considered." *U.S. Surgical Corp. v. Orris, Inc.*, 5 F.Supp.2d 1201, 1210 (D.Kan.1998). In a trademark infringement case, " 'the inquiry generally will turn on whether actual or potential 'purchasers' are confused. . . . If likelihood of confusion exists, it must be based on the confusion of some relevant person; i.e., a customer or purchaser.' " *Id.* (quoting *Electronic Design & Sales, Inc. v. Electronic Data Sys. Corp.*, 954 F.2d 713, 716 (Fed.Cir.1992)). Where the products or services are commercially-sold, " 'only those users who might influence future purchases can be considered relevant

---

**3.** The high degree of care with which the sponsors proceed in making vision care program se-lections is discussed in further detail below.

persons.' " *Id.* (quoting *Electronic Design,* 954 F.2d at 718).

To determine the class of "relevant persons" in this case, the court first notes that three "levels" of consumers are represented: sponsors, providers, and members. Plaintiff admits that its customers, referred to as its "sponsors," are primarily employers, associations, and unions that make the insurance plans available to their employees. Optometrists and opthalmologists furnish the vision care available under the plan, such as eye exams and eyeglass prescription dispensary services, and thus are referred to as "providers." Individual employees, the "members" of each eye care program, are the actual beneficiaries of the vision care plans.

Most individuals may participate in only one vision care plan, because, as conceded by plaintiff, typical sponsors do not offer a choice of vision care plans to their employees. The sponsors are the true customers to whom both parties' programs are marketed; a sponsor selects a plan based on its calculation of the needs and preferences of its employees. Thus, it is the occurrence of actual confusion among sponsors that is relevant to the likelihood of confusion analysis.

Plaintiff offers numerous instances of misdirected calls and mail, received by Spectrum but apparently intended for Spectera, as evidence of actual confusion. As further evidence of actual confusion, plaintiff offers testimony from the depositions of two of Spectrum's eye care providers' employees, as well as from a person responsible for the development of a provider network, regarding the confusion each encountered due to the similarity of the Spectrum and Spectera tradenames.

Even assuming that each of the instances of confusion alleged by plaintiff truly indicates confusion between plaintiff and defendant,[4] plaintiff fails to demonstrate sufficient evidence of actual confusion at the sponsor level. Instead, the instances of actual confusion offered by plaintiff were generally experienced at the provider level. The court finds confusion between plaintiff's and defendant's tradenames at the provider level irrelevant for purposes of this litigation. Providers are not targeted by the marketing efforts of plaintiff and defendant; at most, errors in claims processing made by the providers' clerical staff only delay the payment of claims by defendant.[5] Quite simply, providers do not participate in the market in which the parties sell their respective services, and plaintiff has advanced no evidence to suggest that the providers have any influence whatsoever on the purchasing decisions of plaintiff's sponsors. *See Orris,* 5 F.Supp.2d at 1211 (surgeons' confusion as to source of medical equipment irrelevant because surgeons had no effect on the hospital's purchasing decisions).

The only example of actual confusion at the sponsor level offered by plaintiff is that one of its sponsors mistakenly referred to Spectrum as "Spectra Vision" in a memorandum distributed to its employees. Apparently, the memorandum was intended to clarify the manner in which to assist employees in locating the names of providers available under plaintiff's Preferred Vision Care plan. The court finds this evidence insufficient, however, to suggest the type of actual confusion at the sponsor level that would impact plaintiff's commercial fitness. Specifically, it is unlikely that, as a result of this typographical error, the sponsor would, or could, for

---

**4.** There is some question as to whether many of the alleged instances of confusion are actually mere misspellings or mispronunciations of plaintiff's name that would occur regardless of defendant's use of the Spectera name; a large number of the misdirected calls and correspondence referred to "Spectra," not "Spectera." Despite plaintiff's evidence of the Midwestern tendency to drop the middle syllable of "Spectera," it is unable to establish that each call or letter referencing "Spectra" was truly intended for defendant. Furthermore, plaintiff fails to adequately account for the possibility that any calls for "Spectra Vision" might have been intended not

for Spectera, but instead for "Spectra Vision," a pay-per-view movie company.

**5.** Because plaintiff's discount is applied at the point of sale, no claims are submitted to plaintiff's company. In contrast, defendant's services are more involved, and require the submission of claims to the defendant. Therefore, any consequence of misdirected mail has no effect on plaintiff's affairs, and could do nothing but cause a detriment to *defendant's* reputation if the claim was not paid promptly.

that matter, change from plaintiff's vision care plan to defendant's, or that any individual policyholder would have the opportunity to switch to defendant's vision care plan. Moreover, the court notes that this instance of actual confusion refers not to defendant's "Spectera" tradename, but instead to "Spectra Vision." Finally, the court finds it compelling that this memorandum is entitled, in large type, "Preferred Vision Care," clearly indicating that this sponsor primarily refers to plaintiff's service as such, while referring to the Spectrum company name, though misreferenced as "Spectra Vision," only secondarily. .

With respect to the numerous instances of misdirected telephone calls received by plaintiff, in which callers asked for "Spectra Vision" or "Spectera Vision," the court finds the calls have little bearing on the likelihood of confusion analysis. Specifically, there is no evidence that these calls were made by prospective purchasers of plaintiff's eye care plan, or that the callers had any influence over those in the position to purchase plaintiff's plan. In the absence of any evidence that the calls were placed by "relevant persons," i.e., plaintiff's customers, the evidence of misplaced telephone calls and mail is insufficient to create an issue of material fact as to actual confusion. *See Lang v. Retirement Living Pub. Co., Inc.,* 949 F.2d 576, 582–83 (2d Cir.1991) (no material fact issue existed as to actual confusion because "there is no reason to believe that confusion represented by the phone calls could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation.")

According to plaintiff, an additional instance of actual confusion occurred when an eye care provider mistakenly provided a member of Spectrum's plan with a piece of Spectera's promotional literature. Contrary to plaintiff's assertion, however, the court finds that actual confusion in this context would not harm the reputation or marketing efforts of plaintiff in any meaningful manner. The plaintiff has offered no evidence that a member may, if he or she wishes, enroll in a different eye care plan than that which is offered by his or her employer. In fact, plaintiff concedes that members typically are offered no choice of eye care plans at all.[6] Therefore, it is unlikely that a member's receipt of defendant's brochures rather than plaintiff's has any impact on plaintiff, because the member simply is in no position to purchase defendant's eye care plan over plaintiff's. Further, the plaintiff has offered no evidence as to how this instance of confusion could be detrimental to its reputation or goodwill.

### 2. *"Post-sale" Confusion*

The court notes that although not expressly characterized as such, to the extent that the evidence of actual confusion on the part of providers and/or members can be interpreted as "post-sale" confusion, the court finds that it is not the type of post-sale confusion prohibited by the Lanham Act.

Courts addressing the likely confusion inquiry have considered the likelihood of confusion on three temporal planes: pre-sale, point-of-sale, and post-sale. *See generally* 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 23.5 (4th ed.1996). Pre- and point-of-sale confusion as to the source or affiliation of a particular product or service may be dispelled by the time of purchase, and thus no harm to plaintiff may occur. *See id.* Post-sale confusion, on the other hand, involves the confusion experienced not by actual purchasers, but by *observers* of the purchased product. *See id.*

---

**6.** The only evidence offered by plaintiff in this regard is its assertion that the *dependents* of members may have a choice as to eye care plans, because, plaintiff argues, those dependents *may* have the choice to participate in either the plan offered by their own employer or, alternatively, in the plan offered by their parents' employer. The court finds this attenuated reasoning unpersuasive and speculative; surely, the class of potential persons to which this possible choice of plans may be presented is quite limited. Indeed, the coverage of dependents is usually limited to those under a certain age, and not all employers offer vision plans; the chances that these variables coincide on a frequent basis is probably slim. In any case, the plaintiff has failed to offer substantiated evidence that this type of "dependent choice" exists to any appreciable degree. Consequently, the court accords little weight to this "evidence" of likely confusion.

Although the Tenth Circuit has not yet squarely addressed the issue, the Federal Circuit concluded that the "consideration of post-sale confusion in determining likelihood of confusion is not inconsistent with Tenth Circuit trademark law, and would likely be adopted by the Tenth Circuit if it considered the issue head-on." *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 989 (Fed. Cir.1993) (citations omitted). There, the Federal Circuit held that the district court's failure to consider the effect of post-sale confusion constituted an abuse of discretion. *Id.* at 990.

The court's research reveals that many of the cases in which post-sale confusion significantly impacted the likely confusion analysis relate to "knock-off" or counterfeit goods. *See, e.g., Payless Shoesource,* 998 F.2d at 986; *Keds Corp. v. Renee Intern. Trading Corp.*, 888 F.2d 215 (1st Cir.1989); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145 (4th Cir.1987). Post-sale confusion in these types of cases is presumed to negatively affect plaintiff's commercial viability in one of two ways. First, an observer may mistakenly attribute any shoddy workmanship of the look-alike product to the producer of the more expensive product, such that the plaintiff's reputation is compromised. *Payless Shoesource,* 998 F.2d at 989. Second, although purchasers of cheap, imitation products would not themselves experience confusion as to the authenticity of the product, the purchaser might benefit from the prestige normally associated with the genuine article, and thus the more expensive manufacturer would suffer a loss of sales to the imitator. *See Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1455 (9th Cir.1991).

There is no indication that any of the incidents of actual confusion alleged by plaintiff, even if characterized as involving "post-sale" confusion, could ostensibly cause plaintiff to suffer a loss of reputation, good will, or business. Although post-sale confusion is largely concerned with non-purchasers, as the members and providers may be arguably classified, the overriding purpose is to alleviate any potential damage plaintiff may sustain as a result of the post-sale confusion.

Thus, post-sale confusion necessarily requires an examination of the universe of relevant customers. Because the evidence of actual confusion advanced by plaintiff does not affect potential purchasers of plaintiff's services, it is insufficient to create an issue of material fact as to actual confusion.

In sum, the court finds that any evidence of actual confusion on the part of providers or members is *de minimis* for purposes of this action. As the *Universal Money* court explained,

> Evidence of actual confusion of a very limited scope may be dismissed as de minimis: Probable confusion cannot be shown by pointing out that at some place, at some time, someone made a false identification. De minimis evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding likelihood of confusion, especially where, as here, [defendant] has introduced substantial, reliable evidence in support of its motion for summary judgment demonstrating no significant actual confusion *in the marketplace.*

*Universal Money,* 22 F.3d at 1535. (citations and internal quotations omitted) (emphasis added). Because Spectrum has failed to offer any significant evidence of actual confusion on the part of its customers, it has failed to allege "sufficient facts of actual confusion showing that there is a genuine issue for trial on the likelihood of confusion issue." *Id.* at 1536.

### E. Degree of Care Likely to Be Exercised by Purchasers

An additional factor relevant to the likelihood of confusion analysis is the "degree of care with which consumers choose the products in the marketplace." *Universal Money,* 22 F.3d at 1533. Likelihood of confusion is inversely related to the degree of care exercised by potential customers; "a consumer exercising a high degree of care in selecting a product reduces the likelihood of confusing similar tradenames." *Heartsprings,* 143 F.3d at 557.

In its papers, plaintiff argues that the court must focus on the degree of care exercised by the "end-users" of its product: the

providers and members. Plaintiff thus urges the court to consider the degree of care exercised by providers when distributing the parties' promotional materials to patients. Plaintiff argues that because the providers incur no expense when distributing the promotional literature, the degree of care exercised is low. Further, plaintiff claims, the member exercises little, if any, care in the receipt of these materials, and would thus not be aware if he or she was given the incorrect materials.

The court finds plaintiff's reliance on the degree of care at the provider and member level misplaced, however. As previously discussed, the relevant consumers in this action are each plan's sponsors. Thus, the likelihood of confusion is not to be evaluated from the standpoint of the providers or members, but instead from that of the sponsors. Consequently, the court concludes that it is the sponsors' degree of care with which the likelihood of confusion inquiry is concerned.

In this case, the degree of care factor weighs heavily against a finding of likelihood of confusion. The uncontroverted facts reveal that both parties' potential customers, the sponsors, exercise a high degree of care, or "thorough due diligence," when deciding whether to purchase a vision care plan. In fact, potential sponsors are frequently courted by a number of different eye care plans, and typically receive detailed promotional materials emphasizing the favorable aspects of each candidate's program. Ordinarily, these promotional efforts are aimed only toward those high-level employees of potential sponsors with the authority and experience to make health care benefits decisions. Each potential sponsor is encouraged to evaluate each of its eye care plan options carefully, and generally performs a comprehensive analysis of each plan's· coverage features. Indeed, as part of the selection process, a potential sponsor will often hire benefits consultants to help determine which plan is best suited to meet its needs.

The uncontroverted facts thus establish the particularly high degree of care associated with each sponsor's eye care plan selection process. Accordingly, the degree of care factor weighs heavily against a finding of likelihood of confusion.

## F. Strength of Mark

The final factor in the likelihood of confusion analysis is referred to as the mark's "strength." "Strength" is traditionally measured by the mark's use by others: "[a] strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *First Sav. Bank*, 101 F.3d at 653. The protection accorded a particular mark is directly proportional to its relative strength; "[t]he stronger the mark, the more likely it is that encroachment on it will produce confusion." *Id.* (citation omitted). Because the strength of a trademark is diluted by a wide or common use of the mark by others, "[t]he greater the number of identical or more or less similar marks already in use on different kinds of goods, the less is the likelihood of confusion between any two specific uses of the same mark." *Id.* at 653–54.

Plaintiff does not dispute the fact that 1,108 federal, state and common law service marks or trademarks using the word "Spectrum" exist. In fact, two of plaintiff's own sponsors include the word "Spectrum" as part of their corporate name.

Plaintiff offers little to contradict the contention that its tradename is weak. Accordingly, in light of the "well-established principle that extensive third-party use of the disputed term indicates that the term itself deserves only weak protection," the court concludes that this factor weighs strongly in defendant's favor. *First Sav. Bank*, 101 F.3d at 654.

## G. All Relevant Factors Considered as a Whole

As the final step in its analysis, the court must consider all of the relevant factors together to determine whether there exists a material fact issue as to the likelihood of confusion. *Heartsprings*, 143 F.3d at 558. "Because no single factor is dispositive... a genuine dispute of material fact will not exist if all relevant factors, properly analyzed and considered together, nonetheless indicate

consumers are not likely to be confused." *Id.* The court has considered each factor relevant to the likelihood of confusion analysis, and determines that no reasonable factfinder could conclude that a likelihood of confusion exists between plaintiff's and defendant's marks.

Of the six relevant factors, only two, the disputed marks' similarity, and the similarity of the parties' services and marketing practices, weigh in plaintiff's favor. The marks' apparent resemblance is diminished, however, once the marks are analyzed as traditionally presented to relevant consumers. Similarly, the parties' products are less similar than would at first appear if evaluated from the standpoint of a relevant consumer.

The remaining factors weigh strongly in favor of defendant. The uncontroverted facts fail to establish defendant's intent, in the adoption of its marks, to trade on plaintiff's goodwill or to otherwise associate itself with plaintiff. Additionally, the extensive third-party use of the "Spectrum" name renders plaintiff's mark fairly weak. Most importantly, the high degree of care exercised by both parties' customers, and the lack of relevant evidence of actual confusion militate against a finding that a likelihood of confusion exists.

That two factors arguably weigh in plaintiff's favor does not cause the court to hesitate in its ruling. Indeed, summary judgment on the likelihood of confusion issue is not inappropriate merely because the defendant has not "carried the day" on each of the six relevant factors. In fact, the Tenth Circuit has recently affirmed this court's grant of summary judgment despite weighing some of the factors in plaintiff's favor. *See Heartsprings,* 143 F.3d at 557 (summary judgment affirmed despite very strong mark and virtually identical tradenames) (citing with approval its holding in *Coherent, Inc. v. Coherent Techs., Inc.,* 935 F.2d 1122, 1125–27 (10th Cir.1991) (judgment against plaintiff affirmed despite similarity of products, trade channels, marketing practices, and tradenames)).

Accordingly, after carefully considering, as a whole, all factors relevant to the likelihood of confusion inquiry, the court finds that plaintiff has failed to establish that there exists a material fact issue for trial as to the likelihood of confusion.

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiff's motion for summary judgment (doc. 95) is denied.

IT IS FURTHER ORDERED THAT defendant's motion for summary judgment (doc. 93) is granted, and plaintiff's claims are hereby dismissed.

IT IS FURTHER ORDERED THAT defendant's motion to amend the pretrial order (doc. 107) is denied as moot.